# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00024-CR

**Nathan Frazier, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-16-904090, THE HONORABLE BOB PERKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Nathan Frazier of criminally negligent homicide and found that he used or exhibited a deadly weapon during the commission of the offense. *See* Tex. Penal Code §§ 1.07(17)(B), 12.35(c)(1), 19.05(a). The jury assessed his punishment, enhanced pursuant to the state jail repeat offender punishment provision, at confinement for eleven years in the Texas Department of Criminal Justice and a $10,000 fine. *See id.* §§ 12.33, .425(c).

On appeal, appellant challenges the sufficiency of the evidence supporting his conviction, complains about error in the jury charge, asserts that his sentence is "grossly disproportionate" to his crime, and contends that the trial court erred by admitting evidence of his prior out-of-state felony convictions that were used for enhancement. We will modify the written judgment to correct non-reversible error and affirm the trial court's judgment of conviction as modified.

## BACKGROUND

The jury heard evidence that shortly after 8:00 p.m. on March 12, 2015, after the sun had set, Margarita Ramirez was driving her Nissan Altima with her fifteen-year-old daughter, Jazmin, who was seated in the front passenger seat, and her twenty-two-month-old son, Alejandro, who was seated in his child-safety seat behind Ramirez in the backseat.[1] The family was on their way to attend a cross-country event in which Ramirez's other daughter, twelve-year-old Yvette, was competing. They were travelling eastbound on Parmer Lane when, at the intersection of Parmer Lane and Highway 130, appellant drove his eighteen-wheeler tractor-trailer into the right passenger side of the Altima where Jazmin was seated as Ramirez was turning left onto the access road of Highway 130.

The evidence reflected that, after appellant "T-boned" the Altima, Jazmin was trapped in the car until emergency responders were able to extract her. She was transported by emergency-rescue helicopter to the hospital, but efforts to save her, including emergency surgery, were unsuccessful. The medical examiner testified that Jazmin had sustained a high-impact brain injury, multiple rib fractures, pelvic fractures, and lacerations to both her aorta and liver, which caused internal bleeding. The doctor explained that the brain injury, the aortic laceration, and the liver lacerations were all potentially fatal injuries.

Ramirez sustained lacerations to her arm and face, contusions to her chest wall and jaw, and a vertebral artery dissection. She was transported from the collision scene by ambulance to the same hospital where Jazmin was flown. Despite her injuries, she was with her

---

[1] Because all the members of the Ramirez family share the same last name, we refer to the children by their first names.

daughter, talking to her and holding her hand, when Jazmin died from the injuries sustained in the collision.

Young Alejandro was transported from the collision scene by ambulance to a children's hospital. He sustained a "right frontal minimally displaced skull fracture without underlying intracranial injury" that did not require neurosurgical intervention; doctors determined that the fracture would heal on its own in six to eight weeks. In addition, Alejandro had multiple lacerations on his face and his wrist that required stitches. He also needed surgery to remove numerous pieces of embedded glass from his skin. He required a follow-up procedure, under sedation, to remove his sutures.

At trial, Ramirez recounted what she could recall about the collision. She explained that she was driving her Altima eastbound on Parmer Lane and stopped at the traffic light at the intersection of Parmer Lane and Highway 130. She was at the red light, waiting to turn left onto the access road to Highway 130. She was behind several cars; the westbound traffic was stopped. According to Ramirez, the light turned green—including the left-turn arrow—and the cars ahead of her moved through the green light. She followed the car turning left in front of her; she was about a car's length behind it. But when she proceeded into the intersection, she "saw lights really close up," and then "the hit." The evidence showed that appellant, driving his eighteen-wheeler tractor-trailer westbound on Parmer Lane, struck the right side of the Altima where Jazmin was seated.

Duane Hartman, a trooper with the Department of Public Safety, responded to the collision. When he arrived at the location, the injured parties (Ramirez and her children) had

3

already been removed from the scene to be transported to the hospital.[2]  Appellant, who had not been injured in the collision, was still on the scene.  Trooper Hartman took photographs of the vehicles and the scene, which were admitted into evidence.  He observed tire marks, tread, gouges, yaw marks, and skid marks on the road.  The trooper explained that, based on his observations and experience, he concluded that appellant's eighteen-wheeler had struck Ramirez's car "head-on, a T-bone" on the car's right side, pushing it off the road, over the curb, and onto the grass.  He clarified that the skid marks on the road resulted from Ramirez applying her brakes as her car was "pushed with its tires in a lateral motion"; there was no indication that appellant applied his brakes at all.  Trooper Hartman spoke with appellant at the scene. Appellant told the officer that he was "traveling along Parmer westbound into the city" and "as he approached the intersection, he looked at his GPS coordinates or his Garmin to make sure he was actually heading in the right direction; as he looked up, he was in the intersection where the collision took place."  According to the trooper, appellant was unable to tell him what color the traffic light was when he entered the intersection.

In a related civil lawsuit against appellant and his trucking company, appellant testified in a video deposition.[3]  In his deposition testimony, appellant stated that about 200 to 300 feet before the intersection, his GPS chimed, and he looked down at his cell phone, which,

---

[2]  The evidence showed that officers from several other law-enforcement agencies had already responded to the scene.  In addition, firefighters responded to the scene because appellant's truck caught on fire.

[3]  A transcript of the deposition was admitted at trial, and portions were read to the jury. The video recording itself was not admitted into evidence.

4

he explained, was propped up against the cup holders in the area down by the center console.[4] He said that "when [he] raised [his] head back up, that car was in front of [him] and [he] couldn't react and [he] hit it." Appellant admitted that he failed to keep a proper lookout. He acknowledged that he did not brake at all before the collision. Appellant also admitted that he never saw the car that turned left in front of the Ramirez car and "didn't even know there was another car. . . in front of that car, ever, period." He said that he "took [his] eyes off the road for three to five seconds . . . not three to five seconds, two to three seconds . . . ain't no car going to go in front of me and then another car's going to come right behind it."

Appellant denied being fatigued or tired at the time of the collision but admitted that he was driving in violation of the federal safety regulation that limits driving time to a maximum of eleven hours. Appellant denied running a red light because he "[knew] what kind of driver [he was]," although he admitted that because he was already "up under" the traffic light when he looked up from his GPS just before the impact, he could not have known what color it was. He further acknowledged that he told officers that night that he did not know what color the light was when he entered the intersection. Appellant agreed that "you can't stop a truck like you can stop a car." He also agreed that intersections are possible areas of hazard and that commercial drivers should plan for hazards when approaching intersections. Appellant acknowledged that he was not "driving defensively" at the time of the collision.

The jury also heard expert testimony from Thomas Hartman, a former sergeant with the Department of Public Safety who had worked for DPS for thirty years, twenty of them

---

[4] It appears from the record that appellant had a GPS device and was also using a GPS application on his cell phone. His testimony was unclear as to which device he was looking at, but he consistently indicated that he was looking down toward the center console area at either the GPS device or his phone. We use the term "GPS" to represent either his GPS device or the GPS on his phone.

in the commercial vehicle enforcement division. Sergeant Hartman explained that because no one can safely operate any vehicle if they are tired and fatigued, there are specific regulations that address fatigued driving of a commercial motor vehicle. He described the rules and regulations, both federal and state, concerning limits imposed on drivers of commercial vehicles to prevent fatigued driving and to manage driving time and distances. He examined appellant's electronic logs, which, he explained, are required to be kept by all drivers of commercial vehicles, and testified that appellant's logs reflected that on the day of the collision, appellant had been driving in excess of the eleven-hour maximum at the time of the collision.

Sergeant Hartman also discussed the "safe driving" policy of appellant's employer, which included "[t]ak[ing] extra care in cities . . . at stop signs and red lights" and "[w]hen in doubt, slow down, it is more important to arrive safely than on time." He explained that a commercial vehicle driver has to allow for stopping distances and the size of the vehicle and that "when you're approaching an intersection, there is always a possibility, if it's a light, it could be a stale light, and you should be aware of that light changing at any time so you can allow plenty of time to stop." In addition, Sergeant Hartman talked about the federal safety regulation prohibiting unauthorized passengers in a commercial motor vehicle, and the company policy of appellant's employer that, consistent with that regulation, "there will be no riders allowed." He explained that unauthorized passengers in the vehicle "could cause distraction."[5]

Appellant was indicted for three offenses arising out of the March 12th collision: manslaughter in connection with Jazmin's death, aggravated assault in connection with the injuries that Ramirez sustained (recklessly causing bodily injury and using a motor vehicle as a

---

[5] The evidence reflected that, at the time of the collision, appellant had an unauthorized female passenger in the sleeper compartment of his truck.

6

deadly weapon), and aggravated assault in connection with the injuries that Alejandro sustained (recklessly causing bodily injury and using a motor vehicle as a deadly weapon). The case proceeded to trial. The State called six witnesses: Ramirez, who testified about what she recalled of the collision, about the injuries that she and her son sustained, and about her daughter's death; a flight paramedic, who testified about treating Jazmin at the scene of the collision; the medical examiner, who testified about conducting Jazmin's autopsy and the findings concerning the child's injuries and her cause of death; a patrol officer, who was dispatched to the collision scene; Trooper Hartman, who testified about responding to the collision scene, investigating the accident, and interviewing appellant; and Sergeant Hartman, who testified as an expert in commercial vehicle enforcement. In addition, the State offered appellant's deposition testimony, reading portions of it in question-and-answer form to the jury. Appellant called no witnesses.

The trial court submitted four offenses to the jury: the charged offense of manslaughter and, on the State's request, the lesser-included offense of criminally negligent homicide (relating to Jazmin's death); aggravated assault (relating to Ramirez's injuries); and aggravated assault (relating to Alejandro's injuries). The jury found appellant not guilty of manslaughter but convicted him of criminally negligent homicide and found him not guilty of both aggravated assaults. In addition, the jury found that appellant had used or exhibited a deadly weapon, a motor vehicle, during the commission of the criminally negligent homicide.

During the punishment phase, the State presented evidence of appellant's driving history, which included two other driving accidents that did not involve his commercial vehicle (including one the week after the collision that killed Jazmin), and his criminal history, which included multiple convictions, both misdemeanor and felony, for distribution of marijuana in

7

Virginia, and evidence that approximately three weeks after the March 12th collision he was arrested for possession with the intent to distribute "three different drugs," including cocaine and marijuana. In its punishment verdict, the jury found that appellant had previously been convicted of two felony offenses as alleged in the enhancement paragraphs of the indictment and assessed appellant's punishment at eleven years in prison and a $10,000 fine. This appeal followed.

## DISCUSSION

Appellant raises three points of error. In his first point of error, he challenges the sufficiency of the evidence supporting his conviction. In his second point of error, he complains about jury-charge error. In his third point of error, he asserts that his sentence violates the constitutional prohibition against disproportionate sentences and, further, contends that the trial court erred by admitting the evidence of his out-of-state felony convictions.

### Evidentiary Sufficiency

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018); *see Musacchio v. United States*, — U.S.—, 136 S.Ct. 709, 711–12 (2016); *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). In our sufficiency review, we consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or

8

submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Braughton*, 569 S.W.3d at 608. We consider only whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016); *see also* Tex. Code Crim. Proc. art 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Braughton*, 569 S.W.3d at 608; *Arroyo*, 559 S.W.3d at 487; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (stating that reviewing court must not usurp jury's role by "substituting its own judgment for that of the jury"). Instead, we must defer to the credibility and weight determinations of the factfinder. *Braughton*, 569 S.W.3d at 608; *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016). When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *Cary*, 507 S.W.3d at

9

757; *see Musacchio*, 136 S.Ct. at 715 (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton*, 235 S.W.3d at 778); *accord Arroyo*, 559 S.W.3d at 487.

Because factfinders are permitted to make reasonable inferences, "[i]t is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *accord Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). The standard of review is the same for direct and circumstantial evidence cases. *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020); *Jenkins*, 493 S.W.3d at 599; *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015).

The sufficiency of the evidence is measured by comparing the evidence produced at trial to "the essential elements of the offense as defined by the hypothetically correct jury charge." *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "A hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at

10

240). The State requested submission of criminally negligent homicide as a lesser-included offense to the charged offense of manslaughter. A person commits this homicide offense "if he causes the death of an individual by criminal negligence." Tex. Penal Code § 19.05(a); *see id.* § 6.03(d) (defining culpable mental state of criminal negligence).

To support a conviction for criminally negligent homicide, the evidence must establish that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Gonzalez v. State*, — S.W.3d —, No. AP-77,066, 2020 WL 6482409, at *33 (Tex. Crim. App. Nov. 4, 2020); *Montgomery*, 369 S.W.3d at 192–93; *see* Tex. Penal Code §§ 6.03(d), 19.05(a). "The circumstances are viewed from the standpoint of the actor at the time that the allegedly negligent act occurred." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (quoting *Montgomery*, 369 S.W.3d at 193); *accord McKay v. State*, 474 S.W.3d 266, 270 (Tex. Crim. App. 2015). "Criminal negligence does not require proof of [a defendant's] subjective awareness of the risk of harm, but rather [the defendant's] awareness of the attendant circumstances leading to such a risk." *Queeman*, 520 S.W.3d at 622 (quoting *Montgomery*, 369 S.W.3d at 193). "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Id.* (quoting *Montgomery*, 369 S.W.3d at 193); *see Gonzalez*, 2020 WL 6482409, at *33 ("The key to criminal negligence is the failure to perceive the risk.").

11

Concerning criminal negligence, the Court of Criminal Appeals has explained:

> [U]nder the law, criminal negligence is different from ordinary civil negligence. Civil or simple negligence means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. Conversely, [c]onduct that constitutes criminal negligence involves a greater risk of harm to others, without any compensating social utility, than does simple negligence. The carelessness required for criminal negligence is significantly higher than that for civil negligence; the seriousness of the negligence would be known by any reasonable person sharing the community's sense of right and wrong. The risk must be substantial and unjustifiable, and the failure to perceive it must be a gross deviation from reasonable care as judged by general societal standards by ordinary people. In finding a defendant criminally negligent, a jury is determining that the defendant's failure to perceive the associated risk is so great as to be worthy of a criminal punishment. The degree of deviation from reasonable care is measured solely by the degree of negligence, not any element of actual awareness. Whether a defendant's conduct involves an extreme degree of risk must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in death or injury to another.

*Queeman*, 520 S.W.3d at 623 (internal citations and quotations omitted); *see Montgomery*, 369 S.W.3d at 192–95; *Tello v. State*, 180 S.W.3d 150, 156–58 (Tex. Crim. App. 2005).

The question of whether driving error rises to the level of criminal negligence is not a simple one, but we are guided by the Court of Criminal Appeals' opinion in *Queeman*. *Queeman* addressed "whether a death caused by two driving errors—the failure to control speed and the failure to maintain a proper distance between vehicles—prove[d] a gross deviation from the standard of care that an ordinary person would exercise under the circumstances." 520 S.W.3d at 619. There, Queeman was driving on a two-lane highway when his van rear-ended an SUV that was making a left turn off the highway onto an intersecting street. *Id.* The collision killed a passenger in the SUV. *Id.* The driver of the SUV testified that she could not remember whether her vehicle was stopped at the time of the accident and told investigators that

12

she did not use her turn signal. *Id.* at 620. Queeman testified that he was driving the speed limit and attempted to avoid the collision "but was unable to completely evade it." *Id.* An accident investigation determined that the SUV's brake lights were illuminated and that Queeman did not attempt to brake until just before or at the time he struck the SUV but could not quantify Queeman's pre-impact speed. *Id.* at 620–21. The court concluded that the evidence was sufficient to support a finding that Queeman was speeding, failed to maintain a safe distance, and was inattentive but that there was no evidence that he was "grossly negligent by speeding excessively over the speed limit" and "no evidence . . . that he was grossly negligent in terms of the length or reason for his inattention." *Id.* at 625–26. As a result, the court concluded that the evidence only presented a case of "ordinary negligence that stems from misjudging speed and distance that may result in civil liability for traffic collisions." *Id.* at 628. This conduct, the court held, was a deviation from the ordinary standard of care required to satisfy civil negligence, but absent evidence of more egregious conduct, did not constitute a gross deviation from the standard of care required for criminal negligence. *Id.* at 630.

In this case, it is undisputed that appellant was driving the eighteen-wheeler tractor-trailer that "T-boned" the Altima in which Jazmin was a passenger and that the collision caused Jazmin's death. Thus, it is undisputed that appellant's conduct caused Jazmin's death, and appellant does not dispute that the evidence supports such a finding. Appellant argues, however, that his conduct, like that of Queeman, does not rise to the standard of criminal negligence. He maintains that driving with a GPS is a "common activity" and that the evidence demonstrated only brief inattentiveness when he looked down at his GPS while driving. He further contends that the driving acts alleged in the indictment are acts of "ordinary negligence"

13

that do not support criminal negligence.[6]  We disagree, although we find that *Queeman* sheds light on resolving the sufficiency issue in this case.

We begin by pointing out that the jury, as the factfinder, was tasked with deciding how long appellant's attention was diverted from the road based on the evidence presented. While appellant asserted in his deposition testimony that he only looked down at his GPS in the center console area for "two to three seconds," the jury was free to reject this evidence and disbelieve that his inattention was merely "brief" as he now claims.  Ramirez testified that she had the green left-arrow light and moved into the intersection after the car in front of her, who also proceeded into the intersection on that green left-arrow light, had turned onto the access road.  Yet appellant denied ever seeing that car.  A reasonable inference from that evidence is

---

[6] The application paragraph for criminally negligent homicide in the jury charge incorporated the driving conduct alleged in the amended indictment and instructed the jury to find appellant guilty of criminally negligent homicide

> if you unanimously believe from the evidence beyond a reasonable doubt, that the defendant, NATHAN FRAZIER, on or about the 12th day of March, 2015, in the County of Travis, and State of Texas, did then and there with criminal negligence cause the death of Delia Jazmin Ramirez by operating a motor vehicle and causing said motor vehicle to collide into and against a motor vehicle occupied by Delia Jazmin Ramirez, and NATHAN FRAZIER was criminally negligent, namely: by looking at a GPS device in an unsafe manner, by looking away from the road in an unsafe manner, by proceeding into an intersection without observing a traffic signal, by failing to observe other vehicles entering or in an intersection before proceeding into said intersection, by failing to obey a traffic signal, by failing to sufficiently apply brakes, by failing to take sufficient evasive action, by failing to maintain a proper lookout, by operating a commercial vehicle in violation of federal and/or state regulations, or by operating a commercial motor vehicle in violation of employer policies[.]

These various allegations of how appellant drove constitute how appellant was criminally negligent; that is, they are the manners and means of how he committed criminally negligent homicide. *See Flores v. State*, 536 S.W.3d 560, 576 (Tex. App.—San Antonio 2017, pet. ref'd). These alternative manner and means were presented disjunctively to the jury; thus, proof of any one is sufficient for conviction. *See Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

14

that appellant looked down at his GPS for far longer than he acknowledged to Trooper Hartman or in his deposition. Looking down for such an extended period that he wholly failed to observe a car's presence when it turned in front of him constituted evidence of a significant span of inattention and a substantial period when his eyes were off the road while he was looking down at his GPS. *Cf. Queeman*, 520 S.W.3d at 626 (noting that nothing in record showed where appellant was looking, reason for his inattentiveness, or length of time that he was inattentive).

Also, Ramirez testified that the westbound traffic was stopped at the red light, as she was while she was waiting for the light to turn green so that she could turn onto the access road. Then, she testified that both she and the car in front of her proceeded into the intersection on the green left-turn arrow, which supported a finding that the traffic light for the westbound traffic—including appellant—was red when she was making her left turn and was struck by appellant. Although appellant denied running a red light in his deposition testimony (based on his driving habits), Trooper Hartman's testimony reflected that appellant was unable to tell him that night, immediately after the collision, what color the light was when he drove into the intersection. In addition, one of the first responding police officers testified that he spoke with appellant on the scene and asked him what had happened, and appellant told him that "he didn't know what had happened" and said that "[h]e had been looking at his GPS at the time and didn't know what color the light was." The evidence indicated that, contrary to his denials, appellant ran the red light when he entered the intersection.

Further, while there was no explicit evidence as to what appellant's speed was at the moment of impact in terms of miles per hour, the evidence reflected that his speed on impact was such that the collision caused multiple fatal and "blunt force injuries" to Jazmin as well as extensive damage to both vehicles. In addition to the medical examiner's testimony that

15

Jazmin's cause of death was "blunt force injuries," the medical records indicated that Jazmin was in a "motor vehicle collision in which she was T-boned by an 18-wheeler at highway speeds on her side of the vehicle" and was "involved in a high-speed collision with an 18-wheeler at highway speeds." Trooper Hartman testified that the speed limit on Parmer Lane at that location is 65 miles per hour. In his deposition testimony, appellant estimated that he was going between 40 and 45 miles per hour because he believed that the speed limit was 50 out there; he denied going "in excess of 50 miles per hour" because he was unfamiliar with the area. However, the photographs of the vehicles after the collision—particularly the extensive damage to Ramirez's Altima and the passenger-seat area where Jazmin was trapped—demonstrate that a high-speed high-force impact occurred. Thus, the evidence, and reasonable inferences from it, showed that when appellant had a red light, instead of stopping at the light as he should have (or even attempting to slow down by applying his brakes), appellant was travelling into the intersection with enough speed to cause a high-force impact. The jury could have found that this was evidence of speed that was excessive under the circumstances.

Furthermore, Sergeant Hartman testified that appellant was violating federal regulations limiting driving time, which are specifically designed to prevent fatigued driving. While appellant denied being fatigued or tired at the time of the collision in his deposition testimony, he admitted violating the safety regulation. Sergeant Hartman explained that the driving-safety regulations, including the eleven-hour rule—that once a commercial vehicle driver reaches eleven driving hours, he is required to stop and rest for ten hours before again operating a commercial vehicle—have been in place "for many, many years." The existence of such regulations demonstrates that regulatory authorities have recognized and determined that drivers themselves are not the best judges of their own fatigue level. Further, appellant was driving at

16

night when he was violating the safety regulation designed to prevent fatigued driving, and appellant acknowledged in his deposition testimony that "fatigue and lack of alertness are bigger problems at night."[7]

While using GPS assistance while driving may be a "common activity," appellant mistakes what conduct constituted the gross deviation in this case. The gross deviation from the ordinary standard of care was not merely appellant's use of GPS while he was driving, but rather the conduct that appellant engaged in—as alleged in the indictment and shown by the evidence at trial, individually or collectively—that contributed to appellant causing the collision, which included using his GPS, under the attendant circumstances in this case. *See, e.g.*, *Montgomery*, 369 S.W.3d at 195. The evidence in this case demonstrated that, instead of paying attention to the roadway and the approaching intersection, as would be appropriate for any driver but particularly the driver of an eighteen-wheeler tractor-trailer travelling at a speed great enough to cause a high-force impact, appellant looked away from the road and down at his GPS and was inattentive for long enough to completely miss observing the car ahead of Ramirez proceed through the intersection and to fail to see Ramirez move into the intersection and to enter the intersection against a red light instead of stopping or attempting to slow down by applying his brakes, while operating his eighteen-wheeler tractor-trailer after he had exceeded the maximum driving time-limit of the safety regulation imposed to prevent fatigued driving. Thus, unlike in *Queeman*, there was evidence of "more egregious conduct" beyond simply misjudging speed and distance—that is, there was evidence that appellant engaged in "more extreme, aggressive, [and]

---

[7] At one point, in response to questioning during the deposition, appellant emphasized the fact that it was dark when the collision occurred because the sun had already set.

17

foolish driving acts than are ordinarily engaged in by drivers and accepted as reasonable risks in exchange for the social utility provided." *See Queeman*, 520 S.W.3d at 625, 630–31.

From the combined and cumulative force of all the evidence presented in this case, and the reasonable inferences from it, the jury could have found beyond a reasonable doubt that appellant ought to have perceived a substantial and unjustifiable risk of death surrounding his conduct, that he failed to do so, and that his failure to do so constituted "a gross deviation" from the standard of care that an ordinary person would have exercised under all the circumstances viewed from the standpoint of a driver of an eighteen-wheeler tractor-trailer.[8] *See Jenkins*, 493 S.W.3d at 599 (stating that in evidentiary sufficiency review, appellate court must consider "all of the evidence" and "the cumulative force of all the incriminating circumstances"); *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (recognizing that "the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence"). Therefore, we conclude that the evidence is sufficient to support appellant's conviction for criminally negligent homicide. We overrule appellant's first point of error.

**Jury-Charge Error**

In his second point of error, appellant complains about error in the jury charge. Specifically, he contends that the trial court erred by including certain language describing the

---

[8] We do not suggest, as appellant asserts that the State does on appeal and did at trial, that a driver of eighteen-wheeler tractor-trailer is held to a "higher driving standard" as a commercial driver. We merely note that the evidence reflected that, at the time of the conduct at issue, appellant was driving an eighteen-wheeler tractor-trailer and, as with any driver, the size and character of the vehicle being driven is a factor to be considered in the driving conduct. *See Queeman v. State*, 520 S.W.3d 616, 623 (Tex. Crim. App. 2017) (explaining that criminal negligence requires proof of defendant's awareness of attendant circumstances leading to risk of harm).

18

manner and means of committing the offense, part of which he objected to at trial, and by including a deadly weapon instruction, to which he did not object at trial.

We review alleged jury-charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury-charge error was preserved in the trial court. *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury-charge error). If the jury-charge error has been properly preserved by an objection or request for instruction, *see* Tex. Code Crim. Proc. arts. 36.14, .15, reversal is required if the appellant has suffered "some harm" from the error, which means the error "was calculated to injure the rights of the defendant." *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020); *see Almanza*, 686 S.W.2d at 171. If the charge error was not properly preserved, the error requires reversal only if the appellant suffered "egregious harm," which occurs when the error "created such harm that the appellant was deprived of a fair and impartial trial." *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019); *see Almanza*, 686 S.W.2d at 171.

During the charge conference, appellant objected to "the words 'or by operating a commercial motor vehicle in violation of employer policies.'" The record does not reflect, but presumably appellant was objecting to the inclusion of these words in each of the application paragraphs of the jury charge. The legal basis for the objection is unclear from the record. After some discussion, it appears that the trial court sustained the objection in some respects but overruled it in others.

19

On appeal, appellant maintains that error exists in the jury charge because the trial court included "by operating a commercial vehicle in violation of federal and/or state regulations, or by operating a commercial motor vehicle in violation of employer policies" in the application paragraph for criminally negligent homicide.[9] According to appellant, the inclusion of this language "add[ed] manner and means language that does not appear in the indictment." However, the amended indictment in this case alleged that appellant was reckless in several ways, including "by operating a commercial vehicle in violation of federal and/or state regulations, and by operating a commercial motor vehicle in violation of employer policies."[10] Thus, the complained-of language did not erroneously "add" a manner and means as appellant contends, and the inclusion of this language in the jury charge was not error.

Appellant further contends that the jury charge contains error because the trial court instructed the jury to make a deadly weapon finding. Citing to *Chambless v. State*, in which the Court of Criminal Appeals stated that "a person may use or exhibit a 'deadly weapon' in the course of committing criminally negligent homicide, but it is not necessarily so," 411 S.W.3d 498, 503 (Tex. Crim. App. 2013), appellant argues that including a deadly weapon

---

[9] We note that the language that appellant complains about on appeal exceeds the scope of the language that he objected to at trial in that he did not object to the inclusion of language about the violation of regulations at trial.

[10] The trial court signed an order granting the State's motion to amend the indictment, which stated:

It is ORDERED by the Court that:
1) the indictment filed in this cause is hereby amended as moved by the State.
2) the State's Motion to Amend the Indictment, Attachment A to said Motion, and this Order are hereby incorporated into and added to the indictment in this Cause, so that the amended indictment in this cause shall read as presented in Attachment A of this Motion.

20

instruction in the jury charge was erroneous because "[a] deadly weapon finding is not an element to the lesser included offense of criminally negligent homicide" and thus "[n]o such finding is required nor [was] it supported by the evidence."

While it is true that the use or exhibition of a deadly weapon is not necessarily an element of criminally negligent homicide, in this case, the amended indictment contained a separate notice paragraph, which alleged that:

> during the commission of said offense, NATHAN FRAZIER used or exhibited a deadly weapon, namely: a motor vehicle, which, in the manner of its use or intended use, was capable of causing serious bodily injury or death[.]

Thus, the State provided pretrial notice to appellant of its intent to seek a deadly weapon finding against appellant.[11] *See Luken v. State*, 780 S.W.2d 264, 266 (Tex. Crim. App. 1989) (explaining that State may seek deadly weapon finding and that "an affirmative finding of use or exhibition of a deadly weapon must be supported by a written pleading, albeit not necessarily in the indictment"); *Ex parte Beck*, 769 S.W.2d 525, 527 (Tex. Crim. App. 1989) (explaining that when State seeks deadly weapon finding against defendant, it must provide notice of that fact to defendant before trial); *Ex parte Patterson*, 740 S.W.2d 766, 777–78 (Tex. Crim. App. 1987), *overruled on other grounds by Ex parte Beck*, 769 S.W.2d 525, 528 (Tex. Crim. App. 1989) (concluding that error arises when trial court submits special issue regarding defendant's use or exhibition of deadly weapon during commission of offense when defendant has not been provided notice that issue will be submitted). In this case, it was the State's intent to seek a deadly weapon finding, conveyed through its pleading, that governed the submission of the deadly weapon issue to the jury, not the elements of the offense or the evidence adduced at trial.

---

[11] We note that the original indictment also contained a notice paragraph that alleged the use or exhibition of a deadly weapon.

Further, the charged greater offense and the lesser-included offense differed only in the culpable mental state—recklessness versus criminal negligence—and the conduct of both offenses involved the same use or exhibition of a motor vehicle as a deadly weapon. Because the State sought a deadly weapon finding in its pleading and provided the requisite pretrial notice to appellant of its intent to seek a deadly weapon finding on the greater charged offense, the trial court properly included the deadly weapon issue in the jury charge.

Concluding that no error exists in the jury charge, we overrule appellant's second point of error.[12]

## Disproportionate Sentence

In his third point of error, appellant asserts that his sentence "was disproportional to the legislative intent of state jail time."

The Eighth Amendment to the United States Constitution, prohibiting cruel and unusual punishment, forbids extreme sentences that are "grossly disproportionate" to the crime. *See Graham v. Florida*, 560 U.S. 48, 58 (2010); *State v. Simpson*, 488 S.W.3d 318, 322–23 (Tex. Crim. App. 2016); *see also* U.S. Const. amend. VIII.

However, to preserve a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must make a timely, specific objection to the trial court. *Marin v. State*, No. 03-16-00731-CR, 2017 WL 5985496, at *1–2 (Tex. App.—Austin Dec. 1, 2017, no pet.) (mem. op., not designated for publication); *see Burt v. State*, 396 S.W.3d 574, 577 (Tex. Crim. App. 2013) (holding that sentencing issue is preserved by

---

[12] Because we conclude that no error exists in the jury charge, we need not reach appellant's claim that he suffered harm. *See Celis v. State*, 416 S.W.3d 419, 423 (Tex. Crim. App. 2013); *Barrios v. State*, 283 S.W.3d 348, 353 (Tex. Crim. App. 2009).

objecting at punishment hearing, when sentence is pronounced, or, in some instances when opportunity not afforded at sentencing, by raising issue in motion for new trial); *Navarro v. State*, 588 S.W.3d 689, 690 (Tex. App.—Texarkana 2019, no pet.) ("To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired." (quoting *Russell v. State*, 341 S.W.3d 526, 527 (Tex. App.—Fort Worth 2011, no pet.))); *Williams v. State*, 191 S.W.3d 242, 262 (Tex. App.—Austin 2006, no pet.) ("Claims of cruel and unusual punishment must be presented in a timely manner."); *see also* Tex. R. App. P. 33.1(a) (to preserve complaint for appellate review, party must have presented specific and timely request, motion, or objection to trial court).

Here, as the State correctly notes, appellant did not complain about his sentence—that it was grossly disproportionate to the seriousness of his offense or that it was "disproportionate to the legislative intent of state jail time"—when the trial court imposed his sentence or in any postconviction motion.[13] Therefore, appellant has failed to preserve this complaint for appellate review. *See, e.g.*, *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (holding that defendant waived complaint regarding violation of state constitutional right against cruel and unusual punishment because complaint was raised for first time on appeal); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (holding that defendant waived complaint that punishment was cruel and unusual under Eighth Amendment when complaint was raised for first time on appeal).

---

[13] In fact, before imposing the sentence assessed by the jury, the trial court asked appellant if he could state any reason to the court as to why sentence should not be imposed; appellant responded, "No, sir."

23

## Out-of-State Convictions

At the beginning of the punishment phase of trial, and again when documentary exhibits relating to his prior felony convictions from Virginia for distribution of marijuana were offered, appellant objected to the admission of the documentary evidence of his prior felony convictions because, "There's no affirmative showing in either pen packet of what the weight was, what the amount was, merely that it's a felony conviction." Though not entirely clear, it seems from the record that appellant's concern was that a felony amount of marijuana under Virginia law would include an amount of marijuana that would only be a state jail felony under Texas law and a state jail felony cannot be used for enhancement under the state jail repeat offender punishment provision. *See* Tex. Penal Code § 12.425(c) (providing that at trial of aggravated state jail felony, defendant shall be punished for second-degree felony upon proof of previous felony conviction "other than a state jail felony"). *But see id.* § 12.41(1) (providing than "any conviction not obtained from a prosecution under [the Texas Penal Code] shall be classified as [a] 'felony of the third degree' if imprisonment in . . . another penitentiary is affixed to the offense as a possible punishment"). Based on a discussion about the Virginia marijuana-distribution laws, of which the trial court took judicial notice, the trial court concluded that, given the five-year sentence that appellant received for his offenses, appellant was charged with "regular felonies and not state jail felonies" and overruled appellant's objection.

In his third point of error, appellant also complains that the trial court "erred in admitting the Out of State conviction used to enhance punishment" because "the State failed to establish the admissibility of his conviction from Virginia as the State failed to meet its burden that the law in Virginia is the same as in Texas." Given the minimal argument presented in his brief, it is difficult to discern the argument that appellant raises here, although it is clear that he

24

complains about the trial court's admission of the documentary evidence relating to his prior felony convictions.

Appellant cites to *Langston v. State*, in which the Court of Criminal Appeals, in addressing a challenge to the admission of an out-of-state pen pack, held that "[w]hen an out of state pen packet has been introduced as evidence of prior criminal record at the punishment phase, the State, as proponent of evidence must establish, either by proof, or request that the trial court take judicial notice of, what our sister state considers sufficient documentary proof of a final conviction." 776 S.W.2d 586, 587–88 (Tex. Crim. App. 1989). The Court then held the admission of the pen pack to be erroneous in that case because "[i]t is not self-evident that any of these documents is the functional equivalent of the judgment and sentence required by Texas law to prove up a valid prior final conviction." *Id.* at 588. Here, after merely citing to *Langston*, appellant asserts that the State failed to show that either State's Exhibit #57 or State's Exhibit #58, which are sentencing orders relating to his prior Virginia convictions for felony distribution of marijuana, "is a properly certified judgment and sentence in contemplation of Virginia law" and that "there was no further assurance that this document is proof of a final judgment." Notably, appellant does not complain about the admission of State's Exhibit #59, a certified copy of a Virginia penitentiary packet containing the same sentencing orders as in exhibits #57 and #58. Appellant then—in two short sentences with a cite to *Ex parte Pue*, 552 S.W.3d 226 (Tex. Crim. App. 2018)—complains that the sentencing orders do not show a final conviction because they do not contain language reciting that the conviction is a final conviction and because they reflect that, after the sentences were imposed, part of the sentences were later suspended.

Appellant did not object to the admission of the documentary evidence of his prior Virginia felony convictions based on complaints that the exhibits did not constitute

adequately authenticated proof of his prior Virginia felony convictions or that they failed to reflect that such convictions were final. Rather, his objection at trial was that those exhibits did not demonstrate that the prior Virginia felony convictions constituted "felonies" in Texas for purposes of enhancement because the amount of marijuana distributed was unknown based on the documentation of his prior felony convictions.

To preserve a complaint for appellate review, a party must timely object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1(a)(1)(A); *see Gonzalez*, 2020 WL 6482409, at *5. While it is not necessary to employ "magic words" or cite to specific statutes or rules, a party must convey the substance of the complaint to the trial court. *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011) (citing *Ford v. State*, 305 S.W.3d 530, 533 (Tex. Crim. App. 2009)); *see Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016). Furthermore, the complaint on appeal must comport with the objection raised at trial. *See Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017) (confirming that complaint on appeal must comport with trial objection to preserve error); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016) ("If a trial objection does not comport with arguments on appeal, error has not been preserved."); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). Because appellant did not object to the documentary evidence of his prior Virginia felony convictions based on insufficient authentication under *Langston* or its purported failure to reflect finality, his

26

complaint about the purportedly erroneous admission of this documentary evidence of his out-of-state felony convictions on these grounds is not preserved for appellate review.[14]

After reviewing the record before us, we conclude that appellant failed to preserve the complaints raised in this point of error for appellate review. Accordingly, we overrule appellant's third point of error.

## Clerical Errors in Judgment

The State has filed a motion asking this Court to modify the written judgment of conviction to correct non-reversible clerical error in the written judgment of conviction.

The judgment states that appellant's plea to the enhancement paragraph of the indictment was "TRUE." However, as the State correctly points out, the record reflects that at the beginning of the punishment phase of trial, appellant entered pleas of "Not True" to all of the enhancement paragraphs contained in the amended indictment.

---

[14] To the extent that appellant also attempts to raise a sufficiency challenge to the evidence supporting his prior convictions, we conclude that any sufficiency claim is inadequately briefed. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017) (affirming that "an appellate court has no 'obligation to construct and compose [an] appellant's issues, facts, and arguments with appropriate citations to authorities and to the record" (quoting *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008))); *Lucio v. State*, 353 S.W.3d 873, 877–78 (Tex. Crim. App. 2011) (finding point of error inadequately briefed where brief contained single-sentence assertion and was unaccompanied by any other argument or authorities); *see, e.g.*, *Serrano v. State*, No. 03-15-00654-CR, 2017 WL 4228717, at *7 (Tex. App.—Austin Sept. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant's assertion that evidence was insufficient with mere cite to seminal case did not suffice to comply with briefing requirements). Moreover, we observe that *Ex parte Pue* involved an out-of-state conviction with a fully probated sentence, which is not the case here.

27

This Court has authority to modify incorrect judgments when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we grant the State's motion.

Further, through our review of the record, we note that the judgment contains additional non-reversible error. The judgment states that appellant was convicted of a third-degree felony. However, the offense of criminally negligent homicide is a state jail felony, *see* Tex. Penal Code § 19.05(b). While the jury found appellant guilty of an aggravated state jail felony, *see id.* § 12.35(c)(1) (providing that defendant found guilty of state jail felony "shall be punished for a third degree felony" if deadly weapon was used or exhibited during commission of offense), and the jury then found the allegations of the enhancement paragraphs of the indictment, which alleged prior felony convictions, to be true, and appellant was thus punished as a repeat offender, *see id.* § 12.425(c), it was the punishment range, not the degree of offense, that was enhanced, *see Ex parte Reinke*, 370 S.W.3d 387, 389 (Tex. Crim. App. 2012) (drawing distinction between "enhancing the level of the offense and enhancing the level of punishment"); *cf. Ford v. State*, 334 S.W.3d 230, 234 (Tex. Crim. App. 2011) (noting Court of Criminal Appeals' prior recognition "that Penal Code Section 12.42 increases the range of punishment applicable to the primary offense; it does not increase the severity level or grade of the primary offense"). Therefore, the judgment should reflect that appellant was convicted of a state jail felony not a third-degree felony.

Accordingly, we modify the judgment of conviction to reflect that appellant's "Plea to 1st Enhancement Paragraph" was "NOT TRUE" and to reflect that the "Degree of Offense" is "STATE JAIL FELONY."

28

**CONCLUSION**

Having concluded that the evidence is sufficient to support appellant's conviction for criminally negligent homicide, that no error exists in the jury charge, and that appellant failed to preserve for appellate review his complaints that his sentence is grossly disproportionate to his crime or that the trial court erred in admitting the documentary evidence of his out-of-state felony convictions, but having concluded that non-reversible error exists in the written judgment, we modify the judgment to reflect that appellant's "Plea to 1st Enhancement Paragraph" was "NOT TRUE" and to reflect that the "Degree of Offense" is "STATE JAIL FELONY." As so modified, the trial court's judgment of conviction is affirmed.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Modified and, as Modified, Affirmed

Filed:   January 8, 2021

Do Not Publish